UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

MORELIA CONSULTANTS, LLC, :
THE CHRISTOPHER ENTERPRIZE, : NO.: 3:10-CV-00432
LLC, CRH NAPLES DEVELOPMENT, :
LLC, and CHRISTOPHER : (JUDGE MUNLEY)
HILDEBRANT, : (MAGISTRATE JUDGE BLEWITT)
      Plaintiffs : (MAGISTRATE JUDGE PRINCE)
:
v. :
:
RCMP ENTERPRISES, LLC, UNITED :
PENN INVESTMENT GROUP, LLC, :
THOMAS KRETCHIK, :
CHRISTOPHER M. WARTELLA, :
STANLEY MALINOWSKI a/k/a "Rick :
Malinowski," MICHAEL :
OLENGINSKI, and JEFFREY N. :
WOYTOWICH, :
      Defendants :
:

---

## REPORT AND RECOMMENDATION

Pursuant to an Order entered on June 4, 2010 (Doc. 42), Honorable Thomas

Blewitt referred defendants' pending motions to dismiss to the undersigned Magistrate

Judge for the purpose of preparing a Report & Recommendation.

## I. Background

This case arises out of various business dealings among the plaintiffs and

defendants, with many threads interwoven into a tattered tapestry of contractual

discontent. In an 81-page, 397-paragraph amended complaint, and through the course of

19 separately numbered counts, plaintiffs accuse defendants of all manner of "nefarious"

deeds, from breach of contract to mail and wire fraud.

*(A) Facts of the case*

Because this case is before the Court on motions to dismiss, the facts as stated are drawn from the complaint and assumed to be true for present purposes.


(1) Overview of the parties

The four plaintiffs in this case consist of one individual, Christopher Hildebrant, resident of Ohio, and three limited-liability companies: Morelia Consultants, LLC, an Ohio company; The Christopher Enterprize, LLC, also an Ohio company; and CRH Naples Development, LLC, a Florida company. (Doc. 16, ¶¶ 1–4.)

Two limited-liability companies and five individuals comprise the defendants. Defendant RCMP Enterprises, LLC is a Pennsylvania company; United Penn Investment Group, LLC was a Florida company until it was dissolved on September 14, 2007 for failure to observe corporate formalities. (*Id.* ¶¶ 5–6, 31.) The five individual defendants, Thomas Kretchik, Christopher M. Wartella, Stanley "Rick" Malinowski, Michael Olenginski, and Jeffrey N. Woytowich, are all residents of Pennsylvania. (*Id.* ¶¶ 7, 9–10, 12–13.) Each of the individual defendants were members of RCMP and held themselves out to be members of United Penn. (*Id.* ¶ 14.)


(2) Relationships among the defendants

Using his financial means as leverage, Kretchik manipulated the other individual defendants "to do his bidding," and "controlled and dominated RCMP and United Penn." (*Id.* ¶ 8.) No one challenged Kretchik's dominance of RCMP; instead, the other individual defendants "fell in line with and carried out Kretchik's every whim." (*Id.* ¶ 15.) Malinowski and then Wartella were nominally the managing members of RCMP, but they were little more than "Kretchik's mouthpiece and sounding board." (*Id.*)

2

Kretchik personally paid some of RCMP's financial obligations, and at other times caused RCMP to have only enough funding "to pay certain limited obligations as they became due." (*Id.* ¶ 18.) Kretchik conducted "ongoing, direct[,] and constant oversight," "control[ling] and dominat[ing]" nearly every decision and issue. (*Id.*) RCMP "operated at Kretchik's whim[;] if he did not wish the company to take a certain action, he would simply refuse to fund it." (*Id.* ¶ 21.) This control over the funding allowed Kretchik to keep the other individual defendants from making any substantive decisions or taking any actions without his approval. (*Id.*)

Several of the individual defendants used RCMP funds to pay personal obligations and vice versa. (*Id.* ¶ 26.) Woytowich used an RCMP credit account to pay for "certain personal obligations relating to certain real property" that he personally owned. (*Id.* ¶ 26(a).) Kretchik withdrew funds from an RCMP account for payments he personally made on a loan to Olenginski and "relating to certain properties commonly referred to as the 'Mermaid Properties.'" (*Id.* ¶ 26(b).) Malinowski paid personal obligations under a lease from RCMP funds. (*Id.* ¶ 26(d).)

United Penn's principal address was the same address that both RCMP and Wartella used. (*Id.* ¶ 29.) Although United Penn was dissolved in September 2007, the individual defendants "allowed and even caused United Penn to enter into contracts and incur obligations." (*Id.* ¶ 32.)

(3) The Cypress Lease

In July 2007, Malinowski, Wartella, and their consultant Franklind Lea traveled to Cincinnati, Ohio to meet with Hildebrant. (*Id.* ¶ 40.) The purpose of the meeting was for Malinowski, Wartella, and Lea to solicit Hildebrant's services in purchasing and developing a property called the "Weeks Fish Camp," a thirty-acre parcel in Estero, Florida. (*Id.*)

Soon after this meeting, Malinowski learned that Hildebrant owned a home in Fort Myers, Florida, near the Weeks Fishing Camp. (*Id.* ¶ 42.) Following Malinowski's inquiry, on September 12, 2007, he and Hildebrant entered into a lease (the "Cypress Lease") for Hildebrant's Fort Myers property. (*Id.* ¶ 43–44.) The lease, which was a contract between Hildebrant and Malinowski individually, was for the period from November 1, 2007 to December 31, 2008. (*Id.* ¶¶ 47–48.) It called for rent of $2000 per month if paid before the tenth of the month, or $2100 otherwise. (*Id.* ¶ 47.)

Soon after Malinowski took possession, Hildebrant learned of certain of Malinowski's conduct that plaintiffs colorfully describe as "nefarious," behavior that, Hildebrant was told, was the result of Malinowski's "personal problems." (*Id.* ¶ 49–50.)

During the term of the lease, RCMP funds were used to pay rent. (*Id.* ¶ 51.) On one such occasion, RCMP mailed a check dated January 1, 2008, for $2000 to Hildebrant in Ohio. (*Id.* ¶ 55.) The check was returned for insufficient funds. (*Id.* ¶ 56.) Malinowski failed to pay rent starting on March 1, 2008 and continuing through the term of the lease. (*Id.* ¶ 60.) On or about May 1, 2008, Hildebrant terminated the Cypress Lease for reasons including Malinowski's failure to pay rent. (*Id.* ¶ 61.)

When Hildebrant recovered possession of the premises, he observed "substantial damage" to the home. (*Id.* ¶ 65-66.) There were burn marks on the carpets in every room from Malinowski's cigarettes. (*Id.* ¶ 67.) Malinowski had extinguished his cigarettes on the furniture, in the kitchen cabinets, and in the kitchen drawers, and then left the butts there. (*Id.*) The itemized list of expenses for repairs indicates a total repair cost of $42,469.21. (*Id.* ¶ 69.)

### (4) The United Penn consulting agreement

On March 24, 2008, United Penn entered into a consulting agreement with the Christopher Enterprize (the "United Penn Agreement"), under which the Christopher

Enterprize was to provide "assistance and guidance for obtaining a loan" for United Penn. (*Id.* ¶ 74.) At the time this agreement was made, the individual defendants represented United Penn as being a validly existing company, although it had in fact been dissolved previously. (*Id.* ¶ 75.) The Christopher Enterprize relied on this representation when it entered into the United Penn Agreement. (*Id.*)

As part of the agreement, United Penn was to pay the Christopher Enterprize $100,000 for "assistance and guidance" in obtaining a loan of $1.5 million or more. (*Id.* ¶ 76(a)). The agreement required United Penn to pay $5000 in advance of any consultations. (*Id.* ¶ 76(b). Although the Christopher Enterprize provided the promised assistance and guidance, United Penn did not pay the $100,000 fee. (*Id.* ¶ 77.)

Both parties to this contract took various actions in the effort to get the loan for United Penn. United Penn engaged the services of a business called R&R Finance to help in building credit. (*Id.* ¶ 80.) Kretchik executed and submitted several documents to R&R on behalf of United Penn as part of the credit-building endeavor. (*Id.* ¶ 81.) Meanwhile, the Christopher Enterprize "expend[ed] considerable efforts" on the process and did ultimately obtain financial commitments for United Penn. (*Id.* ¶¶ 79, 82.)

### (5) The Christopher Enterprize consulting agreement

On October 17, 2007, CRH Naples Development, LLC, the Christopher Enterprize, and RCMP drafted a term sheet outlining the business relationship between the Christopher Enterprize and RCMP. (*Id.* ¶ 94.) The Christopher Enterprize was to provide consultation to RCMP about the Weeks Fish Camp. (*Id.*)

RCMP sent Hildebrant a $12,000 check dated December 1, 2007, in payment for services performed under the term sheet, but the check was returned for insufficient funds. (*Id.* ¶¶ 95–96.)

On January 31, 2008, the three parties entered into a formal agreement, supplanting the term sheet. (*Id.* ¶ 97.) Among the terms of the agreement was a provision by which the Christopher Enterprize was to be paid $6000 for its consulting services. (*Id.* ¶ 98.) They executed an addendum to their agreement on August 14, 2008. (*Id.* ¶ 100.) (The January 31 agreement and the August 14 addendum are, collectively, the "Christopher Consulting Agreement.") According to its terms, the agreement was intended to be "the complete and sole understanding between the parties with respect to the subject matter" of the agreement. (*Id.* ¶ 101.)

The Christopher Consulting Agreement provided that in exchange for the Christopher Enterprize's consultation on the Weeks Fish Camp, RCMP would pay the Christopher Enterprize $10,000 monthly from September 1, 2008 to September 30, 2010, as well as a 10% commission. (*Id.* ¶ 103.) Despite the Christopher Enterprize's performance of all of its duties under the Christopher Consulting Agreement, the only payment that RCMP ever made to the Christopher Enterprize was a single payment of $10,000 on September 1, 2008. (*Id.* ¶¶ 107–09.)

### (6) The Morelia consulting agreement

After Malinowski was removed from RCMP management because of "personal problems," Hildebrant and other agents of Morelia Consultants agreed to provide "more resources and time to the Weeks Fishing Project [sic]." (*Id.* ¶¶ 114–15.)  On September 1, 2008, Morelia entered into a consulting agreement with RCMP, one of the terms of which stated that the agreement represented the "complete and sole understanding between the parties with respect to [its] subject matter." (*Id.* ¶¶ 116–17.) In exchange for Morelia's assistance "in the financing and development of Weeks Fish Camp into a viable commercial project," Morelia was to be paid a 10% commission as well as a $10,000

monthly fee for the 25-month period from September 1, 2008 to September 30, 2010.[1] (*Id.* ¶ 118.) Although RCMP and Kretchik did make some payments under the agreement, some payments were late and others were not made at all. (*Id.* ¶¶ 122–27.) For payments that Kretchik personally made on the Morelia Consulting Agreement, he reimbursed himself from RCMP funds. (*Id.* ¶ 132.)

(7) The letters of November 24, 2009 and January 13, 2010

On November 24, 2009, Samuel A. Falcone, attorney for RCMP, sent a letter to Morelia, the Christopher Enterprize, and Hildebrant. (*Id.* ¶ 135.) The letter "purport[ed] to describe an agreement" dated September 1, 2008, between RCMP and Morelia. (*Id.* ¶ 136.) Plaintiffs disavow knowledge of any such agreement. (*Id.* ¶ 137.) The November 24 letter referred to Hildebrant as being bound by certain nondisclosure and noncompetition provisions, which, again, while denying the existence of the agreement containing them, plaintiffs insist were never valid or enforceable. (*Id.* ¶¶ 140–41.)

The November 24 letter also described an escrow agreement, under which Hildebrant and certain unspecified others were purportedly to have deposited funds in an escrow account. (*Id.* ¶¶ 142–43(b).) The letter stated that if the indicated funds were not in the escrow account, RCMP would submit information to the Federal Bureau of Investigation suggesting that Hildebrant had committed crimes including "fraud and theft deception." (*Id.* ¶ 143(c).) Plaintiffs claim that defendants knew or should have known that the escrow agreement was not in effect. (*Id.* ¶ 145.) To support their conclusion that the escrow agreement had been dissolved or was never effective, plaintiffs provide excerpts in their complaint from several emails that discuss the escrow agreement.

---

[1] The complaint and the Morelia Agreement itself both refer to the period of the contract as 24 months, although the period from September 1, 2008 to September 30, 2010 is 25 months.

(*Id.* ¶ 147–48). In one, dated March 27, 2009, Hildebrant wrote that he had not received a copy of the executed escrow agreement and that "any and all previous escrow agreement[s] are null and void and that Morelia Consultants, LLC rescinds those agreements." (*Id.* ¶ 147.) A responding email from Kretchik noted that "Hildebrant has agreed to let the escrow account die." (*Id.*) An email from Attorney Falcone to Hildebrant on August 3, 2009 referred to "no formal agreement [being] in place." (*Id.* ¶ 148.)

A letter of January 13, 2010 from Attorney Falcone to plaintiffs' counsel made reference to the same agreement discussed in the November 24 letter. (*Id.* ¶¶ 151–52.) The letter quotes noncompete language from this "phantom" agreement. (*Id.* ¶ 154.)

### (B) Procedural history

Plaintiffs originally commenced this action in the Court of Common Pleas of Luzerne County by Praecipe for Writ of Summons on January 20, 2010, serving the writ on defendants RCMP, United Penn, Kretchik, Olenginski, and Woytowich shortly thereafter. (Doc. 1, ¶¶ 1–2) Plaintiffs filed the complaint on February 16, 2010, and served it on the same five defendants the following day.[2]

On February 26, 2010, RCMP, United Penn, Kretchik, Olenginski, and Woytowich removed the action from state to federal court under 28 U.S.C. § 1441(b), stating juris-diction under § 1331. After defendants filed three partial motions to dismiss and supporting briefs (Docs. 3–5, 7, 9, 12), plaintiffs submitted an amended complaint on April 2, 2010 (Doc. 16). Magistrate Judge Blewitt subsequently filed an order finding the previous motions to dismiss (Docs. 3–5) moot; three new partial motions to dismiss followed.

---

[2] Defendants Wartella and Malinowski had not been served with the summons or the complaint as of February 26 (Doc. 1, ¶¶ 2, 4). Eventually, they were each served with both; Wartella acknowledged service on March 18, 2010 (Doc. 11) and Malinowski on March 24 (Doc. 15).

Defendants RCMP and United Penn moved to dismiss Counts IX, XIII, XIV, XVIII, and XIX of the amended complaint (Doc. 19); Kretchik moved to dismiss Counts IV–VII, IX, XIII, and XV–XIX (Doc. 21); and Olenginski and Woytowich moved to dismiss Counts IV, VII, XIII, XIV, and XVII–XIX (Doc. 22). No defendant has moved to dismiss Counts I–III, VIII, or X–XII. Defendants Malinowski and Wartella have neither answered the amended complaint nor filed a Rule 12 motion.

Before submitting a brief in opposition, plaintiffs filed a motion seeking leave to exceed the page limit specified in Local Rule 7.8. Magistrate Judge Blewitt granted the motion, but limited the leave to forty pages rather than plaintiffs' requested sixty-five. Plaintiffs then submitted a brief in response that was forty pages in length (Doc. 37), but in an order dated June 29 (Doc. 49), the Court found that the brief in opposition failed to comply with the font-size requirements of Local Rule 5.1(c) and that the failure to comply was a purposeful violation of the rule. Accordingly, the Court struck the brief in opposition and its attached exhibits from the record. (*Id.*)

Before the brief in opposition was stricken, defendants filed a joint reply brief on June 1, 2010 (Doc. 39), to which plaintiffs filed a surreply on June 17 (Doc. 48). Subsequent to the filing of the surreply and the order striking the brief in response, plaintiffs moved to refile their brief in opposition (Doc. 50), which was granted on July 16 (Doc. 52). The Court now having the benefit of thorough briefing, the pending motions to dismiss are ripe for consideration.

## II. Standard of Review

The court's task on a Rule 12(b)(6) motion to dismiss for failure to state a claim is to "determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). In doing so, all factual allegations and all reasonable inferences drawn therefrom are

assumed to be true. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). The court, however, need not accept as true a complaint's "bald assertions" or "legal conclusions." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997). Thus, a Rule 12(b)(6) motion does not serve to question a plaintiff's well-pled facts, but rather tests the legal foundation of the plaintiff's claims. *United States v. Marisol, Inc.*, 725 F. Supp. 833, 836 (M.D. Pa. 1989).

The Supreme Court recently abrogated its longstanding decision in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which had held that a complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court retired this "no set of facts" language in favor of a new standard: a plaintiff's obligation to state a claim for relief under Rule 8(a)(2) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As a result of *Twombly*, plaintiffs were required to nudge their claims "across the line from conceivable to plausible." *Id.* at 570. To state a claim that satisfies Fed. R. Civ. P. 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* at 555. "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (citing *Twombly*, 550 U.S. at 555 n.3). According to this standard, courts may dismiss a complaint if it fails to "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

Moreover, the Court's more recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), held that the pleading requirements of Rule 8 mark "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Consequently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the complaint should be dismissed. *Id.* (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

## III. Discussion

### (A) Count XVIII: fraudulent misrepresentation/inducement and count XIX: negligent misrepresentation

#### (1) Negligent misrepresentation

The elements of a claim for negligent misrepresentation are "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (citing *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994)).

In this case, no matter how favorably for plaintiffs the well-pleaded facts are interpreted, the complaint cannot adequately support a claim for negligent misrepresentation. In Pennsylvania, the tort of negligent misrepresentation is "narrowly tailored," and applies only to businesses that provide services or information "that they know will be relied upon by third parties in their business endeavors." *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 286 (Pa. 2005) (citing Restatement (Second) of Torts § 552 (1977)). Following § 552 of the Restatement

(Second) of Torts, which the Pennsylvania Supreme Court has formally adopted, defendants can be liable for negligent misrepresentation only if they "supplie[d] false information for the guidance of [plaintiffs] in their business transactions." Restatement (Second) of Torts § 552(1); *see also Bilt-Rite Contractors*, 866 A.2d at 285 (adopting § 552). None of the matters about which defendants allegedly made misrepresentations was information that was meant to guide plaintiffs in their business transactions. Plaintiffs never consulted defendants as experts; to the contrary, defendants had hired plaintiffs as consultants. Even if all of plaintiffs' statements of fact and conclusions of law were true and correct, there would still be no basis for a claim for negligent misrepresentation.[3]

(2) Fraudulent misrepresentation

A prima facie case of fraudulent misrepresentation consists of five elements: "(1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will be induced to act; (4) justifiable reliance on the representation; and (5) damage to the recipient as a proximate result." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 731 (3d Cir. 1991) (citing *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 454 (Pa. 1971)).[4]

---

[3]The Court further notes that nowhere in Count XIX do plaintiffs ever make use of the word "negligence" or one of its forms other than in the title of the Count. In fact, the numbered paragraphs under Count XIX are little more than a cut-and-paste of Count XVIII, resulting in a superfluity of verbiage that is on a collision course with what the Federal Rules meant to avoid by requiring a "*short* and *plain* statement of the claim." Fed. R. Civ. P. 8 (emphasis added).

[4]Although "misrepresentation" and "fraudulent utterance" are separately listed, there is precedent for considering these two nominally distinct elements as one. *Scaife*, 285 A.2d at 454.

In this case, the appropriate element to consider first is reliance, since this approach can quickly narrow the discussion. The only alleged misrepresentations on which plaintiffs also plead reliance are (1) defendants' intentions when negotiating contracts with plaintiffs (Doc. 16, ¶ 376(a)); (2) the status of United Penn as a validly existing company (*id.* ¶ 376(b)); and (3) the status of defendants' relationship with Franklind Lea (*id.* ¶ 376(d)). Plaintiffs do not plead reliance on any other acts or statements described in ¶ 376 or elsewhere in the complaint. For example, although plaintiffs state that defendants "misrepresent[ed] their intention to pursue a baseless civil action" (*Id.* ¶ 376(g)), the complaint is devoid of any reference to acts taken in reliance on this alleged misrepresentation. The unspecific, conclusory averment in ¶ 380 that plaintiffs "reasonably relied on the aforesaid representations" fails to satisfy the plausibility requirement enunciated in *Twombly* and *Iqbal*; a sweeping generalization in reference to the "aforesaid representations" is not enough to raise plaintiffs' right to relief above a speculative level. As a result, there are only three points of misrepresentation that require further discussion.

A misrepresentation is "[a]ny manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." *A.P. Landis, Inc. v. Mellinger*, 175 A. 745, 746 (Pa. Super. 1934) (citing Restatement of Contracts § 470 (1932)). *See also* Black's Law Dictionary 461 (3d pocket ed.) (defining "misrepresentation" as "[t]he act of making a false or misleading assertion about something," usually with the intent to deceive). *Mellinger* held that an opinion about a matter of law did not amount to a fraudulent misrepresentation. *Mellinger*, 175 A. at 747. The implication is that under Pennsylvania law, a statement can only be a misrepresentation if it is, in the first place, a factual statement.

The matter of defendants' intentions when contracting, and of defendants' relationship with Franklind Lea, are questions of fact. *Cf. Krebs v. United Ref. Co. of Pa.*,

893 A.2d 776, 783 (Pa. Super. 2006) (citing *McDonnell v. Ford Motor Co.*, 643 A.2d 1102, 1105–06 (Pa. Super. 1994)) (noting that in construing an oral contract, parties' intent is a question of fact); *Mellish v. Herlock Neck Duck Club, Inc.*, 886 A.2d 1151, 1158 (Pa. Cmwlth 2005) (citing *McDonnell*, 643 A.2d at 1105–06)) (describing the parties' intent more generally as a question of fact). United Penn's alleged dissolution could be a question of law, of fact, or a mixed question. *See, e.g.*, *United States v. Spokane Mill Co.*, 206 F. 999, 1000 (E.D. Wa. 1913) (describing question of dissolution for failure to pay annual license fee as a question of law); *Spurlock v. Santa Fe Pacific R. Co.*, 694 P.2d 299, 313 (Ariz. App. 1984) ("*De facto* dissolution, in contrast to *de jure* dissolution, is largely a question of fact."); *People v. Oliver Schs., Inc.*, 206 A.D.2d 143, 145 (N.Y. App. Div. 1994) (describing question of whether corporate misconduct warranted dissolution as a mixed question of fact and law); *Sid Westheimer Co. v. Piner*, 240 S.W. 985, 986 (Tex. Civ. App. 1922) (referring to claim that corporation had been dissolved as a question of fact). For purposes of the present motion to dismiss, the uncertainty is best resolved in plaintiffs' favor; thus the dissolution question should be treated as a question of fact.

Little in the complaint addresses the matter of whether defendants intended plaintiffs to rely on their misrepresentations. As general in nature as was the averment of justifiable reliance, ¶ 379 states that defendants "made the misrepresentations in order to induce the [p]laintiffs to do their bidding," a statement that does nothing by itself to allow the Court "to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Elsewhere in the complaint, plaintiffs provide a modicum of detail that more adequately explicates some of the grounds of their claims. They explain that defendants had sought plaintiffs' help in obtaining financing and a line of credit for United Penn (Doc. 16, ¶¶ 74–79, 82), which, if true, reasonably supports an inference that defendants intended plaintiffs to believe that United Penn was a valid and existing

company. Paragraph 255 states that defendants "never really intended to pay" their obligations on the contracts with plaintiffs, suggesting that plaintiffs are alleging that defendants misrepresented their intention to honor their contractual obligations, and reasonably supporting an inference that defendants did intend for plaintiffs to believe that they would make the payments that the contracts required. However, nothing in the complaint explains what Franklind Lea, or defendants' relationship with him, has to do with any of the claims that plaintiffs make. The complaint describes Lea as a consultant to RCMP (*Id.* ¶ 40) with whom defendants breached their agreement (*id.* ¶ 41). There is little else about Lea other than in ¶ 376(d), where plaintiffs claim that defendants "induc[ed] the [p]laintiffs to expand their relationship with [d]efendants" by "[m]isrepresenting the status of their relationship with Franklind Lea." This head-scratching stretch of reasoning fails to raise any right to relief on this matter even to, let alone beyond, a speculative level. The most indulgent reader of the complaint would be hard pressed to find anything that shows that defendants intended reliance on their representations about their relationship with Lea, or even what those representations were.

The final requirement for a claim of fraudulent misrepresentation is that plaintiffs must show that their reliance on the misrepresentation proximately caused them to suffer damage. It requires scant discussion to establish that relying on a falsely stated intention to honor contractual obligations would result in monetary damages; a party that discharges its duties but does not receive the benefit of the bargain may suffer the loss of time, money, services, or other resources. What the complaint does not show is a proximate link between the misrepresentation of United Penn as a valid company and any harm inflicted upon plaintiffs. United Penn may not have been a valid company, but it was not the coupling of this fact with the misrepresentation of its validity that caused plaintiffs to suffer harm; rather—as the averments of the complaint itself make clear—the

harm was the result of defendants' failure to meet United Penn's obligations to pay under the relevant contracts. (*Id.* ¶ 77.)

So, then, the one remaining point on which plaintiffs could make out a prima facie case for fraudulent misrepresentation is defendant's falsely stated intention to pay the amounts contractually promised. But defendants raise an argument that presents an insuperable bar to the viability of this claim of fraud. As defendants point out, a tort claim "may be maintained only when 'the wrong ascribed to the defendant . . . [is] the gist of the action, the contract being collateral.'" *Wood & Locker, Inc. v. Doran & Assocs.*, 708 F. Supp. 684, 689 (W.D. Pa. 1989) (citing *Closed Circuit Corp. of Am. v. Jerrold Elecs.*, 426 F. Supp. 361, 364 (E.D. Pa. 1977) (alteration in original). When a claim arises out of obligations defined by a contract, a plaintiff is limited to a claim based on a contract; a tort claim lies only when "the larger social policies embodied by the law of torts" provide the sole grounds for a cause of action. *Hart v. Arnold*, 884 A.2d 316, 339–40 (Pa. Super. 2005) (citing *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581–82 (Pa. Super. 2003)). Most succinctly stated: "Breach of contract, without more, is not a tort." *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 440 (3d Cir. 1990) (citing *Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 664 (3d Cir. 1993)). *See also Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964) ("To permit a promisee to sue his promissor in tort for breaches of contract . . . would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions."). United Penn's obligation to pay was incorporated into the contract's terms; the failure to pay was a breach of contract, and plaintiffs' remedy lies in a claim under the terms of the contract, not under the broad social polities of tort law.

*(B) Count XVI: breach of the Morelia Agreement*

(1) Validity of the Morelia Agreement

Defendants maintain that the Morelia Agreement is so poorly drafted, with terms so vague and duties so ill-defined, that the contract should be held unenforceable. They claim that the terms of the contract are inconsistent, that its duration is indefinite, and that there is no mutuality of obligation. Plaintiffs, of course, take the opposite position.

The law of the state in which a contract is made determines its formal validity. *Linn v. Employers Reins. Corp.*, 139 A.2d 638, 639 (Pa. 1958) (citing *Bernstein v. Lipper Mfg. Co.*, 160 A. 770 (1932); *Callaway v. Prettyman*, 67 A. 418 (1907)). In the absence of any evidence that the contract was made outside of Pennsylvania, and given that both parties base their arguments on Pennsylvania law, the Court will base its analysis on the laws of the Commonwealth. *Cf. Mann v. Salsberg*, 17 Pa. Super. 280, 1901 WL 3711, at *2 (1901) (applying Pennsylvania law to a contract when there was no "evidence that the contract was to be executed, or was executed, outside the state of Pennsylvania").

An enforceable contract requires "the nature and extent of the mutual obligations [to] be certain, and the parties [to] have agreed on the material and necessary details of their bargain." *Lackner v. Glosser*, 2006 PA Super 14, at ¶ 23. Essential terms include time or manner of performance and price to be paid. *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956).

Much of defendants' argument claiming vagueness concerns ¶¶ 2–3 of the agreement, which read in part:

> ¶ 2. . . . [D]uring the term of this Agreement set forth in Section 3 below, Morelia Consultants, LLC shall assist RCMP in the financing and development of Weeks Fish Camp into a viable commercial project.

> ¶ 3. For the services described, RCMP and Kretchik shall pay Morelia Consultants, LLC a fee of $10,000 per month for a period of 24 months, payable on the fist day of each month beginning September 1, 2008 and ending September 30, 2010, which amounts shall also be used by Morelia Consultants,

LLC for the reimbursement of expenses incurred in connection with the services described above.

(Doc. 16-2, ¶¶ 2–3.) Defendants base their claim that the Morelia Agreement is for an indefinite period of time on their creative observation that although ¶ 3 "references a fee of $10,000 per month for 24 months, nowhere does it state the term" of the Agreement. (Doc. 39, at 11.) Given the explicit reference in ¶ 2 to a term to be described in ¶ 3, it would defy common sense and the plain meaning of English syntax and diction to read the 24-month period defined in ¶ 3 to be anything but the term of both the payments due and the services to be performed. Defendants also argue that the terms of ¶ 3 are inconsistent because the $10,000 was to be paid to Morelia for both their services and the reimbursement of expenses. "Morelia cannot have it both ways," insist defendants; "either the $10,000 per month fee was for services, or for reimbursement of expenses." (*Id.* at 10–11.) Their position is a stretch. The $10,000 could perfectly well be used for both payment for services and reimbursement. Although in practical terms deducting expenses from pay, which might disincentivize spending as much as might be merited, this arrangement is comprehensible and violates no laws or public policies of which the Court is aware.

The Morelia Agreement has its essential terms defined: Morelia Consultants were to provide services in connection with the Weeks Fish Camp for a period of 25 months,[5] during which time they would be compensated at $10,000 per month, expenses incurred to be paid from the $10,000. Signatures of obligors on both sides of the transaction indicate mutual assent. The Morelia Agreement is a valid and enforceable contract.

---

[5]Note again that the term as discussed in the contract is 24 months, although by the range of dates it is 25 months.

(2) Morelia Consulting's claim against Kretchik

Plaintiffs claim against Kretchik personally for breach of the Morelia Agreement. Kretchik responds that he was never a party to the Morelia Agreement and cannot be held liable for any breach.

The parties devote a considerable sum of words and pages to this matter, although for reasons not discernible, both parties make their arguments based on Pennsylvania law and primarily cite federal-court opinions as authority on this state-law question—even though the Morelia Agreement specifically provides that the "validity, interpretation, and performance of [the] Agreement shall be construed and interpreted according to the laws of the State of Ohio." (Doc. 6-2, at 35 ¶ 13.)[6] Accordingly, the Court looks to Ohio law in addressing issues concerning the Morelia Agreement. *Cf. Int'l Paper Co. v. Midvale-Heppenstall Co.*, 63 Pa. D. & C. 2d 627, 628 (Pa. Com. Pl. 1973) ("Where a contract between two corporations, freely negotiated by their respective counsel, expressly provides that questions thereunder will be governed by the law of a specified State, that law will govern all questions arising thereunder, including alleged negligence in performance of the contract, and the statute of limitations of that State will govern.").

When it is not immediately clear who the parties to a contract are, Ohio courts "peruse the contract as a whole to ascertain whether the entirety of the contract resolves the apparent ambiguity." *Alternatives Unlimited-Special, Inc. v. Ohio Dep't of Educ.*, 168 Ohio App. 3d 592, 2006-Ohio-4779, 861 N.E.2d 163, at ¶ 22 (2006). In *Alternatives Unlimited*, the first paragraph of the contract at issue stated that the contracting parties were the Ohio State Board of Education and the Board of Directors of the Cleveland Alternative Learning Academy Community School (CALA). *Id.* ¶ 21. However, it was

---

[6]The Agreement's indication that Ohio law would control the validity of the contract is a catch-22: since the contract's provisions could not be given effect unless the contract were valid, the provisions themselves cannot be the guidepost for how the validity should be determined.

not the Board of Directors, but the "Governing Authority" of CALA, that executed the contract. *Id.* Following an examination of the rest of the contract, with emphasis on which entities the provisions referenced, the court concluded that the signatory Governing Authority, not the Board of Directors, was a party to the contract. *Id.* at ¶¶ 23–29, 30.

In the contract at issue in this case, the introductory paragraph states: "This Consulting Agreement . . . is dated as of September 1, 2008, by and among RCMP Enterprises, LLC . . . , Thomas Kretchik . . . , [and] Morelia Consultant [sic], LLC . . . ." (Doc. 16-2, at 33.) However, the signature block reads:

**RCMP ENTERPRISES, LLC**
By:         Thomas Kretchik
Title:      Managing Member
            /s/ Thomas Kretchik

By:         Christopher Wartella
Title:      Co-Managing Member
            /s/ Christopher Wartella

**Morelia Consultants, LLC**
By:         /s/ Susana Mondragon Barragan
Name:    Susana Mondragon Barragan
Title:      President/CEO

(*Id.* at 36.) Kretchik is mentioned in his individual capacity in the introductory paragraph, but signed only in his capacity as a managing member of RCMP. That he signed as an agent of RCMP, not as an individual, is strong evidence that his signature bound only RCMP to the contract. This observation draws on well-settled principles of contract law. It is axiomatic that "[t]he function of a signature on a contract is to indicate that the signor has accepted the terms of the contract." *Young v. Glaze*, 643 N.E.2d 186, 189 (Ohio Mun. 1994). The lack of a signature evinces a lack of acceptance, and "[a] basic canon of contract construction is that 'a binding agreement will be deemed to have been formed when the parties have had a meeting of the minds through the presentation of an offer by

20

one side and the acceptance of the offer by the other.'" *Marshall v. Beach*, 758 N.E.2d 247, 250–51 (Ohio App. 2001). Without having signed in his individual capacity, Kretchik has a strong case that he was not a party to the contract, although the lack of a signature is not conclusive. *Schleier v. Metzger*, 24 Ohio Law Abs. 476, 1937 WL 2292, at *3 (Ohio App. 1937).

Examining the rest of the contract in keeping with the exhortation of *Alternatives Unlimited*, the Court can discern little to suggest that despite the lack of a personal-capacity signature, Kretchik should be considered a party to the contract. Almost all references to Kretchik are to him as an RCMP agent. Paragraph 4 states that "RCMP shall pay and Kretchik shall cause to be paid" certain amounts to Morelia Consultants in the event that RCMP sells Weeks Fish Camp. (Doc. 16-2, at 33 ¶ 4.) The content of paragraph 8 is an almost-affidavit-like statement by which Kretchik "represents and warrants that he is duly and properly authorized and empowered to act on behalf of RCMP." (*Id.* at 34 ¶ 8.) Paragraph 11 twice makes reference to "RCMP's representative as chosen by Thomas Kretchik." (*Id.* ¶ 11.) Aside from the introductory paragraph, Kretchik as an individual, rather than an RCMP agent, is mentioned only once. Paragraph 3 states that "RCMP and Kretchik shall pay Morelia Consultants" a certain fee. (*Id.* at 33 ¶ 3.) But the contract grants no rights to Kretchik individually; no benefit inures to Kretchik himself. RCMP gets the full benefit of the bargain, which has its full explication in ¶ 2: "Morelia Consultants, LLC shall assist RCMP in the financing and development of Weeks Fish Camp into a viable commercial project."

Despite the two references in the Morelia Agreement to Kretchik as an individual, an analysis of the contract as a whole leads to the conclusion that Kretchik is not individually bound by the Agreement. He signed only as an agent of RCMP; most references in the Agreement are to him as an agent; and given that he receives no personal benefit from the contract, holding him bound to make payments would violate the rule

requiring consideration. *E.g.*, *Brads v. First Baptist Church*, 624 N.E.2d 737, 743 (Ohio App. 3d 1993) (citing John J. Dvorske, J.D., M.A., et al., *Contracts*, *in* 17 Ohio Jurisprudence 3d § 48 (1980)).

### (3) Morelia Consulting's claims against RCMP

RCMP bases its argument against liability under the Morelia Agreement entirely on its position that the contract was not valid. Since the contract is valid and enforceable, the only question is whether plaintiffs sufficiently alleged a breach in their complaint.

In Ohio, a breach-of-contract claim requires pleading "the terms of the contract, the performance by the plaintiff of his obligation, the breach by the defendant, consideration[,] and damages." *Cairns v. Ohio Savs. Bank*, 672 N.E.2d 1058, 1060 (Ohio App. 1996) (citing *Harper v. Miller*, 164 N.E.2d 754 (Ohio App. 1957)). Plaintiffs have adequately alleged all of these elements: the contract was attached as an exhibit to the pleadings (Doc. 16-2, at 33–35) and detailed in the pleadings themselves (Doc. 16, ¶¶ 114–34, 351–64); they alleged their performance, even if not in great detail (*id.* ¶ 335) and RCMP's breach, even if redundantly (*id.* ¶¶ 125–28, 356–58); the complaint and attached copy of the contract both identified consideration (*id.* ¶ 118; Doc. 16-2, at 33 ¶ 3); and they alleged the damages that they suffered (Doc. 16, at ¶¶ 129, 360). There is no basis for dismissal of Morelia's claim against RCMP for breach of contract.

### *(C) Counts IX, XIII, XV, and XVII: unjust enrichment*

Unjust enrichment is "essentially an equitable doctrine, the elements of which are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. 1993) (quoting *Wolf v. Wolf*, 514 A.2d 901 (Pa. Super.

1986), *overruled on other grounds*, *Van Buskirk v. Van Buskirk*, 590 A.2d 4 (Pa. 1991)). A plaintiff must show more than that a defendant merely received some benefit from the plaintiff; recovery is possible only if the defendant "wrongfully secured or passively received" something that it would be "unconscionable" to allow the defendant to retain. *Id.* (citing *Meehan v. Cheltenham Twp.*, 189 A.2d 593 (Pa. 1963)); *Torchia v. Torchia*, 499 A.2d 581, 582–83 (Pa. Super. 1985) (quoting *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. 1973)). When the facts make out a case of unjust enrichment, "the law implies a contract, referred to as either a *quasi contract* or a contract implied in law, which requires that the defendant pay to plaintiff the value of the benefit conferred." *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328–29 (Pa. Super. 1995) (citing *Chesney v. Stevens*, 644 A.2d 1240 (Pa. Super. 1994); *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 449 (Pa. 1969)).

Since a successful unjust-enrichment claim leads to a court implying a contract, it may come as no surprise to learn that unjust enrichment "is not applicable where the relationship among the parties is based on an express agreement." *Birchwood Lakes Cmty. Ass'n, Inc. v. Comis*, 442 A.2d 304, 309 (Pa. Super. 1982) (citing *Roman Mosaic*, 313 A.2d at 305; *Third Nat. Bank & Trust Co. v. Lehigh Valley Coal Co.*, 44 A.2d 571 (1945)). In this case, all of plaintiffs' unjust-enrichment claims are based on express agreements: Count IX is based on the Cypress Lease (*see* Doc. 16, ¶¶ 44, 284–93 (basis of Count IX); Doc. 16-2, at 2–8 (copy of the lease)); Count XIII is based on the United Penn Consulting Agreement (*see* Doc. 16, ¶¶ 74, 320–27 (basis of Count XIII); Doc. 16-2, at 12–15 (copy of the agreement)); Count XV is based on the Christopher Consulting Agreement (*see* Doc. 16, ¶¶ 97, 100, 340–49 (basis of Count XV); Doc. 16-2, at 22–27, 29–31 (copy of the agreement and addendum)); and Count XVII is based on the Morelia Consulting Agreement (*see* Doc. 16, ¶¶ 116, 366–72 (basis of Count XVII); Doc. 16-2, at 33–36 (copy of the agreement)). Accordingly, the doctrine of unjust enrichment is inapplicable on these facts, rendering Counts IX, XIII, XV, and XVII groundless.

*(D) Count XIV: breach of the Christopher Consulting Agreement*

Although Count XIV is named in the motion to dismiss from defendants Olenginski and Wytowich, no argument on the matter appears in any brief from defendants or plaintiffs. There is no basis in the materials before the Court for dismissing this count.

*(E) Count IV: conspiracy*

In order to make out a prima facie case for a civil claim of conspiracy, a complaint must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. 2000) (citing *McGuire v. Shubert*, 722 A.2d 1087, 1092 (Pa. Super. 1988)). Pennsylvania courts also require an element (4): "[p]roof of malice," that is, "an intent to injure." *Petula v. Mellody*, 588 A.2d 103, 107 (Pa. Commw. 1991) (citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979)). A civil conspiracy claim requires an underlying cause of action—that is, the purpose of the conspiracy—in order to proceed. *McKeeman*, 751 A.2d at 660 (citing *Pelagatti v. Cohen*, 536 A.2d 1337, 1342 (Pa. Super. 1987)).

Because a conspiracy claim requires a combination of at least two persons, a single entity cannot conspire with itself. *Lackner v. Glosser*, 892 A.2d 21, 35 (Pa. Super. 2006) (citing *Grose v. Procter & Gamble Paper Prods.*, 886 A.2d 437, 440–41 (Pa. Super 2005)). From this rule flows the intracorporate conspiracy doctrine: because acts of agents are imputed to the agents' principal, agents of a single entity cannot conspire among themselves. *Id.* (citing *Grose*, 886 A.2d at 441). Federal courts applying this doctrine have held that the presence of "mixed motives"—the opportunity for personal

gain while also acting on behalf of a principal—does not remove an actor's conduct from the scope of the agency. *Cf. Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999) (citing *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982)) (discussing mixed motives in the context of the attorney–client relationship). It follows that unless an agent is "acting in a purely personal capacity," the intracorporate conspiracy doctrine applies. *Sung Tran v. Delavau, LLC*, No. 07-3550, 2008 WL 2051992, at *11 (E.D. Pa. May 13, 2008) (citing *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003)).

Before proceeding further, it is worth noting that since RCMP is a corporation, any activities that its agents undertook on its behalf are attributed to RCMP itself, barring any conspiracy claim under the intracorporate conspiracy doctrine. However, since United Penn was dissolved on September 14, 2007 (Doc. 16, ¶ 30), any actions that defendants took after this date and purportedly on behalf of United Penn will nonetheless be attributed to them individually. *Columbia Metal Culvert Co. v. Kaiser Indus. Corp.*, 526 F.2d 724 (3d Cir. 1975) (noting that an agent who acts on behalf of a principal, knowing that the principal does not exist, becomes personally liable).

In their surreply brief, plaintiffs direct the Court's attention to the averments in the complaint that they suggest support their claim of conspiracy. They cite ¶¶ 79, 142, 152, 168–73, and 211–17, which, when stripped of conclusions of law, "periphrastic circumlocutions,"[7] and irrelevance, say less than plaintiffs seem to think. Peppering almost every allegation with phrases like "in a scheme of fraud and artifice" or "in furtherance of their conspiracy" is not enough to establish fraudulent motive or conspiratorial intent. These factually contentless statements of legal conclusions are not entitled to the presumption of truth. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009)

---

[7] *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 (1st Cir. 2007) (quoting *Aulson v. Blanchard*, 83. F3d 1, 3 (1st Cir. 1996)).

(disentitling to presumption of truth allegations that, e.g., the defendants "knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff]" to harsh conditions of confinement).

From these paragraphs, we learn that plaintiffs "provide[d] assistance and guidance" to United Penn in accordance with the United Penn Agreement (Doc. 16, ¶ 79) and that Attorney Falcone wrote two letters to plaintiffs on behalf of RCMP (¶¶ 142, 152). Paragraphs 168 to 171 contain only statements of law—describing the mail-fraud statute, for example (¶ 168)—or proclamations that plaintiffs violated the law (¶ 170). Paragraphs 172(a) to (d) describe actions taken on behalf of RCMP; paragraph 172(e) states that defendants used the U.S. mail service to send "documents, applications, and other information to financial institutions" in an effort to obtain loans and financing for United Penn. The subparagraphs of ¶ 173 generally describe perfectly lawful activity: RCMP's use of the "United States Wires" to transfer funds (¶ 173(a)), to negotiate business (¶ 173(b)), to send copies of business agreements (¶ 173(c)–(d)), to email letters and other documents (¶ 173(e)–(f), (i)), and to send faxes (¶ 173(g)).[8] Of the paragraphs in the range from 211 to 217, the only one with content that is neither irrelevant nor conclusory is 213, which states that beginning in July 2007, defendants "personally and through RCMP and United Penn" induced plaintiffs "to enter into business relationships with promises of immediate and future compensation" that defendants "never really intended to pay."

None of this material supports a conspiracy claim. First, the intracorporate conspiracy doctrine bars any claim based on actions that RCMP took. Second, the only date-specific averment about United Penn describes action taken in July 2007, which was before the company was dissolved, thus also barred by the intracorporate conspiracy

---

[8]Paragraph 173(h) avers that defendants sent a fax to a bank in the name of United Penn, but this has no relevance to any aspect of plaintiffs' conspiracy claim.

doctrine. Third, only actions taken solely in a personal capacity can support a conspiracy claim if an actor is also a corporate agent, and there is no plausible suggestion in the complaint that any of the individual defendants, while "inducing" plaintiffs to do work for them or otherwise carrying out corporate business (e.g., ¶¶ 79, 213), were acting solely in an individual capacity. Fourth, no stated facts suggest that defendants' alleged conspiratorial actions were undertaken maliciously or with an intent to injure plaintiffs; the formulaic recitation claiming defendants' "intent of . . . causing harm" (*e.g.*, ¶ 212) is not enough. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (holding that a "formulaic recitation of the elements of a cause of action" fails to nudge the right to relief "across the line from conceivable to plausible). Finally, none of the actions alleged in the complaint that could reasonably be attributed to the individual defendants—mailing documents to R&R Finance (¶¶ 172(e), 173(g), (i)), transferring funds to or from a bank account (¶ 173(a), negotiating business and transmitting documents (¶¶ 173(b)–(f)), or attemping to obtain a line of credit from a bank (¶ 173(h))—would support a predicate cause of action upon which a claim of conspiracy could be based, because none of them allege illegal behavior or legal behavior done for an unlawful purpose. *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. 2000) (citing *McGuire v. Shubert*, 722 A.2d 1087, 1092 (Pa. Super. 1988)) (listing "a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose"among the elements of a civil conspiracy claim).

### *(F) Counts V and VI: piercing the corporate veil*

In Counts V and VI, plaintiffs seek to pierce the corporate veils of RCMP and United Penn, respectively, and hold the individual defendants liable for the actions taken in the corporate name.

Pennsylvania courts follow the internal-affairs doctrine, under which "courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation." *Guinan v. A.I. duPont Hosp. for Children*, 597 F. Supp. 2d 485, 495 (E.D. Pa. 2009) (quoting *Banjo Buddies, Inc. v. Renosky*, 399 F. 3d 168, 179 n.10 (3d Cir. 2005)); *see also* 15 Pa. Cons. Stat. Ann. § 4145(a) (West 2010) (providing that when the internal affairs of a foreign corporation—that is, a corporation incorporated under any laws other than those of Pennsylvania—are at issue, the law of the jurisdiction of incorporation applies). RCMP is a Pennsylvania corporation and United Penn was a Florida corporation; accordingly, any matters relating to the internal affairs of either corporation during their corporate existence will be reviewed under the laws of Pennsylvania and Florida, respectively.

## (1) RCMP

Plaintiffs seek to hold the members of RCMP personally liable under the "alter ego" theory of veil-piercing, applicable "whenever one party seeks to hold the corporation liable for any claim or debt." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC,* 2004 Pa. Super. 100, ¶ 43 (quoting *Good v. Holstein*, 787 A.2d 426, 430 (Pa. Super. 2001)). Although "there appears to be no clear test or well-settled rule in Pennsylvania . . . as to exactly when the corporate veil can be pierced," *id.*, courts will generally pierce the veil "whenever necessary to avoid injustice," *Plastipak Packaging, Inc. v. DePasquale*, 75 Fed. Appx. 86, 88 (3d Cir. 2003) (quoting *Rinck v. Rinck*, 526 A.2d 1221, 1223 (Pa. Super. 1987)), namely, when the corporate entity "is used to defeat public convenience, justify wrong, protect fraud[,] or defend crime," *Wedner v. Unemployment Comp. Bd. of Review*, 296 A.2d 792, 794 (Pa. 1972) (citing, *e.g.*, *Gagnon v. Speback*, 131 A.2d 619 (Pa. 1957)). Pennsylvania law recognizes a strong presumption in favor of upholding the corporate form; only when there are "specific unusual circumstances

call[ing] for an exception" to the limited liability rule will the veil be pierced. *Id.* (citing *Zubik v. Zubik*, 384. F.2d 267, 273 (3d Cir. 1967)).

Factors to be considered in an alter-ego-theory analysis include, but are not limited to, the following:

> The failure to observe corporate formalities; nonpayment of dividends; insolvency of [the] debtor corporation; siphoning [of] funds from [the] corporation by dominant shareholders; nonfunctioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization.

*E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000) (quoting *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc.*, 758 F. Supp. 1054, 1059 (W.D. Pa. 1990)). Relevant considerations have elsewhere been stated to include "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, use of the corporate form to perpetrate a fraud," and whether "one in control of a corporation uses that control or corporate assets to further his personal interests." *Lumax Industries, Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) (citing *Kaites v. Dept. of Envt'l Res.*, 529 A.2d 1148, 1151 (Pa. Commw. 1987); *Coll. Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 207 (Pa. 1976)). These factors are to be considered not in isolation but as part of the totality of the circumstances. *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 604 (Pa. Super. 1991).

Of the various factors that may be considered, plaintiffs focus their argument on three: undercapitalization, commingling of funds, and use of the corporate form to perpetrate a fraud.[9]

---

[9]Plaintiffs also conclusorily aver that RCMP was dissolved for failure to observe corporate formalities "at one point during times relevant hereto" (Doc. 16, ¶ 24), but this sort of averment lacks the necessary specificity to be entitled to a presumption of truth. Compare this vaguely worded allegation with the more specific and definite allegation regarding United Penn: "On or about September 14, 2007, United Penn was dissolved and

(a) Undercapitalization

To support their claim that RCMP was undercapitalized, plaintiffs cite ¶¶ 18–23 and 225–32 of the complaint, although much of the first six and all of the last eight cited paragraphs contain legal conclusions, conclusory statements, or simple duplications of previous averments that, for purposes of the pending motions to dismiss, are entirely devoid of content. According to the parts of these paragraphs that are entitled to the presumption of truth, Kretchik personally paid "certain obligations" of RCMP, or "caused RCMP to be funded only to the limited extent that it was able to pay certain limited obligations as they became due." (Doc. 16, ¶ 18.) If Kretchik did not wish RCMP to take a certain action, "he would simply refuse to fund it." (*Id.* ¶ 21.)

Plaintiffs and defendants both devote some of their argument to the matter of loans to a closely held corporation from a corporate shareholder. Defendants cite a Third Circuit case for the proposition that courts should not discourage "temporary loans" from shareholders that are used to "keep . . . operations afloat," and that such loans do not support a finding of personal liability for corporate obligations. *Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 118, 198 (3d Cir. 2003) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 503 (3d Cir. 2001)). However, the complaint does not describe Kretchik's payment of RCMP debts as "loans"; the complaint simply said that Kretchik personally made payments, rendering the matter of judicial encouragement of loans to close corporations inapposite.

In their surreply brief, plaintiffs, too, cite *Lutyk*, this time for the proposition that a "corporation that was adequately capitalized when formed, but [that] subsequently suffers financial reverses[,] is not undercapitalized." *Id.* (citing 1 Fletcher Cyclopedia of the Law of Corporations § 41.33). This proposition implies that a corporation that was never adequately capitalized—regardless of its subsequent solvency—is undercapitalized. But

since then has not been an active and validly existing company." (*Id.* ¶ 30.)

nothing in the complaint entitled to be presumed true would support such a conclusion. Plaintiffs proclaim that "[a]t no time was RCMP capitalized or funded to the extent sufficient for it to operate as a separate and distinct going concern" (Doc. 16, ¶ 18), but this formulaic recitation of the conclusion of law that a court would draw does nothing to bolster their case. Under *Twombly* and *Iqbal*, a more specific factual foundation would be needed—for example, that RCMP was capitalized to some particular extent (say, $2 million in equity) with some amount of revenue (say, $1 million annually) but had liabilities and operating costs that consistently exceeded the wherewithal of the corporation. There are no such allegations in the complaint; no mentions of numbers or any concrete facts that, if proven, would support the conclusion that plaintiffs wish to see drawn.

In short, the complaint fails to lay out specific facts that, if proven, would show that RCMP was undercapitalized.

### (b) Commingling of funds

Plaintiffs point to ¶¶ 25, 26, 29, and 235 in support of their argument that the individual and corporate defendants' funds were commingled, although ¶ 25 and parts of other paragraphs are nothing but conclusions and ¶ 235 is a verbatim rehash of ¶ 26. What that leaves, then, are averments that:

- Woytowich paid "certain personal obligations" from an RCMP account;
- Kretchik "caused himself to be paid" from an RCMP account for "payments he personally made on a loan to the benefit of Olengensk [sic]";
- Malinowksi paid personal obligations under the Cypress Lease from RCMP funds; and
- RCMP, United Penn, and Wartella all had the same principal address in Kingston, Pennsylvania.

(Doc. 16, ¶¶ 25, 29.) Plaintiffs properly cite several Pennsylvania cases in which, on

similar facts, courts found commingling of corporate and personal funds. In *Norris v. Jasper*, 15 Phila. Co. Rptr. 640, 1987 WL 582711 (Pa. Ct. Com. Pl. 1987), the two stockholders of the corporation removed assets "as needed" for personal activities, and the corporation assumed liability for joint debts involving one of the stockholders. *Id.* at 649. The owners of the corporation had "failed to distinguish between corporate and personal activities to such an extent that the separate entities of the corporation and owners ceased to exist." *Id.* at 647. Finding that the parties in control of the corporation had used corporate assets to advance their personal interests, the court held that the corporate veil was properly pierced. *Id.* at 648 (citing *Hagar v. Etting*, 408 A.2d 856 (Pa. 1979)).

In another case, the court pierced the corporate veil based in part on a finding that corporate contract payments were "tendered by personal checks, drawn on the personal account" of the corporate president. *S.T. Hudson Eng'rs, Inc. v. Camden Hotel Dev. Assocs.*, 2000 PA Super. 49, ¶¶ 19–21. The corporate president, Malcolm Lazin, was the sole shareholder, officer, and employee of the Camden Waterfront Development Corporation (CWDC), which was in turn the controlling shareholder of Camden Hotel Development Associates (CHDA), a general partnership. CHDA never had a formal partnership agreement. *Id.* ¶ 19. Because Lazin, CHDA, and CWDC were "essentially alter egos of one another," the appellate court affirmed the trial court's decision to pierce CWDC's corporate veil. *Id.* ¶¶ 20–21. *See also Minn. Mining & Mfg. Co. v. Egly*, No. 85-0477, 1989 WL 55384, *3 (E.D. Pa. May 23, 1989) (commingling of funds, including use of personal funds to pay corporate liabilities, led to a finding that the corporation was an alter ego of the defendant).

In this case, the complaint avers that all of the individual defendants except Olenginski withdrew funds from RCMP for personal use, as well as that RCMP, United Penn, and Wartella all had the same address—facts much like those that Pennsylvania

courts have previously found to constitute the sort of "specific unusual circumstances" that support piercing the corporate veil.

### (c) Use of the corporate form to perpetrate a fraud

Plaintiffs rely primarily on *Zubik v. Zubik*, 384, F.2d 267 (3d Cir. 1967) for their argument that the individual defendants used RCMP to perpetrate a fraud. The *Zubik* court noted:

> The defrauded creditor or 'victim' of a business transaction with an undercapitalized corporation, for instance, often has a strong case for piercing the veil of a 'sham' corporation. The controversy in such cases invariably involves some degree of reliance by the plaintiff, contributing to the fraud, or undue advantage or trick accenting the injustice.

*Id.* at 273. (internal citation omitted) (citing L.S. Tellier, Annotation, *Inadequate capitalization as factor in disregard of corporate entity*, 63 A.L.R.2d 1051 (originally published 1959)). But this statement of law fails to support plaintiffs' case. As discussed above, the complaint fails to make out a prima facie case for either undercapitalization or fraudulent misrepresentation. *Supra* Parts III.F.1.a, III.A.2. Nowhere in the complaint do plaintiffs allege any kind of undue advantage or trick. The basis of plaintiffs' dispute with RCMP is essentially its failure to make payments on the various business agreements they had—a simple breach of contract, not fraud or some kind of unusual gross injustice.

### (d) Conclusion

Because plaintiffs' allegations of commingling of funds would, if proven, establish that corporate monies were used for the personal ventures of the shareholders, the complaint states a claim for veil-piercing against RCMP sufficient to survive a motion to dismiss.

### (2) United Penn

United Penn was a Florida corporation until its dissolution in September 2007. Regardless of whether Florida or Pennsylvania law applies to actions taken subsequently in the corporate name, the individual actors (here, defendants) would be personally liable in the event of any judgment against the corporation:

> A director, officer, or agent of a corporation dissolved pursuant to this section, purporting to act on behalf of the corporation, is personally liable for the debts, obligations, and liabilities of the corporation arising from such action and incurred subsequent to the corporation's administrative dissolution . . . .

Fla. Stat. Ann. § 607.1421(4) (West 2010). And in Pennsylvania: "[T]he holder of any other claim [than contingent, conditional, or unmatured contract claims] may bring an action against the dissolved corporation or its directors, officers, or shareholders . . . ." 15 Pa. Cons. Stat. Ann. § 1994(b) (West 2010). *See also Columbia Metal Culvert Co. v. Kaiser Indus. Corp.*, 526 F.2d 724, 727 (3d Cir. 1975) (holding an agent personally liable on a contract when both agent and other contracting party knew that agent's principal was nonexistent).

The nonexistence of United Penn as a valid corporate entity adequately grounds plaintiffs' claim to pierce United Penn's corporate veil.

### (G) Count VIII: participation theory

Plaintiffs seek to impose personal liability on the individual defendants for actions taken in the corporate names of RCMP and United Penn based on participation theory, which imposes personal liability on corporate agents that have personally taken part in the actions of a limited-liability company.

However, participation theory predicates agents' liability on an underlying tort. *Mill Run Assocs. v. Locke Property Co.*, 282 F. Supp. 2d 278, 287 (E.D. Pa. 2003) (quoting *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983)) (holding a corporate officer not liable for a corporate tort "unless [the officer] specifically directed

the particular act to be done or participated, or cooperated therein"). As discussed in the preceding analysis, *supra* Parts III.A, C, E, plaintiffs do not have any viable tort claims that relate to corporate behavior; their claims for conspiracy, unjust enrichment, and misrepresentation all fail, leaving only the nontort claims (RICO and breach-of-contract claims) and tort claims against defendants individually (conversion and trespass to chattels).

Moreover, in terms of factual grounding for a participation-theory claim, plaintiffs have done a truly admirable job in their Count VIII of using many words to say nothing. The entire section of Count VIII, comprising paragraphs 255–64, contains only the most trivial content that is not a statement of law, conclusory, or irrelevant: that the "Individual Defendants are the members of RCMP" (Doc. 16, ¶ 259); and that the "Individual Defendants are, or hold themselves out to be, the members of United Penn" (*Id.* ¶ 260). Other parts of the complaint that plaintiffs reference in their surreply brief are equally impotent in lending credence to their participation-theory claim. For example, paragraph 16 states: "The Individual Defendants did personally participate in the tortious and unlawful conduct subject [sic] of this Complaint and are, therefore, personally and individually liable for the same." (*Id.* ¶ 16.) This mighty decree of assumptions and conclusions of law—conclusions that it is the province of the Court to draw from the evidence, and that it is the duty of the plaintiff to support with specific factual averments—does not establish that defendants personally participated in anything, acted in any way tortiously or unlawfully, or are subject to any kind of liability. As an example of how to ensure that a complaint uses many more pages than necessary, averments like paragraph 16 are superb; but as an example of effective advocacy, one would need to look elsewhere.

Because of a lack of factual grounding or a predicate claim of legal right, plaintiffs cannot maintain their participation-theory claim.

**IV. Conclusion**

It is recommended, therefore, that defendants' motions to dismiss be granted in part and denied in part, as follows: that the motion of RCMP and United Penn be granted as to Counts IX, XIII, XVIII, and XIX and denied as to Count XIV; that the motion of Kretchik be granted as to Counts IV, VII, IX, XIII, XV, and XVII–XIX and denied as to Counts V, VI, and XVI; and that the motion of Olenginski and Woytowich be granted as to Counts IV, VII, XIII, and XVII–XIX and denied as to Count XIV.

<u>s/ William T. Prince</u>
William T. Prince
United States Magistrate Judge

July 21, 2010